# SUMMONS

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

RANDY YOUNG,

    **Plaintiff,**

v.

                                                Civil Action No.: 21-c-277
                                                Judge: King

WESTERN-SOUTHERN AGENCY, INC. AKA
WESTERN & SOUTHERN FINANCIAL GROUP,
WESTERN-SOUTHERN LIFE ASSURANCE
COMPANY AKA WESTERN & SOUTHERN
LIFE INSURANCE COMPANY, AND CHRIS
MATTOX,

    **Defendants.**

To the above-named Defendant:    **Chris Mattox**
                                          **Western & Southern Life**
                                          **200 Association Drive**
                                          **Forbes Center, Ste. 150**
                                          **Charleston, WV 25311**

      **IN THE NAME OF THE STATE OF WEST VIRGINIA**, you are hereby summoned and required to serve upon Charles R. Bailey and Jeffrey M. Carder, whose address is **BAILEY & WYANT, P.L.L.C., P.O. Box 3710, Charleston, West Virginia 25337-3710**, an answer, including any related counterclaim you may have to the Complaint filed against you in the above-styled action, a true copy of which is herewith delivered to you. You are required to serve your answer within twenty (20) days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint and you will be thereafter barred from asserting in another action any claim you may have which must be asserted by counterclaim in the above-styled action.

Dated: _____3-31-21_____

                                                          **Cathy S. Gatson, Clerk**
                                            _____

                                     Clerk of Court
                                              By CPugh

**Exhibit A**

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**RANDY YOUNG,**

**Plaintiff,**

v.

Civil Action No.: 21-C-277

Judge: King

**WESTERN-SOUTHERN AGENCY, INC. AKA
WESTERN & SOUTHERN FINANCIAL GROUP,
WESTERN-SOUTHERN LIFE ASSURANCE
COMPANY AKA WESTERN & SOUTHERN
LIFE INSURANCE COMPANY, AND CHRIS
MATTOX,**

**Defendants.**

### COMPLAINT

COMES NOW, Plaintiff RANDY YOUNG (hereinafter "Plaintiff"), by and through counsel, Charles R. Bailey, Jeffrey M. Carder, and Bailey & Wyant, PLLC, and for his Complaint against Defendants WESTERN AND SOUTHERN LIFE INSURANCE COMPANY and CHRIS MATTOX states as follows:

### PARTIES

1. Plaintiff Randy Young was, at all times relevant herein, a citizen and resident of Elkview, Kanawha County, West Virginia.

2. Defendant Western-Southern Agency, Inc. aka Western & Southern Financial Group is an Ohio corporation, authorized to conduct business in West Virginia and was conducting business in Kanawha County, West Virginia at all times relevant herein.

1

3. Defendant Western-Southern Life Assurance Company aka Western & Southern Life Insurance is a subsidiary of Western-Southern Agency, Inc., authorized to conduct business in West Virginia and was conducting business in Kanawha County, West Virginia at all times relevant herein.

4. Defendant Chris Mattox (hereinafter "Mattox") is a citizen and resident of Kanawha County, West Virginia, and is an agency manager of the Western & Southern Life Insurance Company Charleston, West Virginia office.

### JURISDICTION AND VENUE

5. The acts described herein occurred in the Kanawha County and the State of West Virginia. As all parties herein are subject to the jurisdiction of the State of West Virginia by the fact that subject events that precipitate this action occurred in Kanawha County, West Virginia, venue is proper in the Circuit Court of Kanawha County, West Virginia pursuant to W. Va. Code §56-1-1(a)(1).

6. As the amount of damages in question far exceed the minimum jurisdictional amount pursuant to W. Va. Code §51-2-2, the Honorable State Courts of West Virginia have original and general jurisdiction over this claim. Thus, jurisdiction and venue in this Honorable Court are proper under the State Code of West Virginia as cited hereinabove.

### FACTUAL BACKGROUND

7. Plaintiff worked for Defendants Western-Southern Agency, Inc. aka Western & Southern Financial Group and Western-Southern Life Assurance Company aka Western & Southern Life Insurance (hereinafter collectively referred to as "Western & Southern") for nearly 13 years, from June 2006 through until April 1, 2019.

2

8. Plaintiff was a top performing agent for Western & Southern from 2008 - 2018.

9. During his time with Western & Southern, he had built a sizeable book of business which entitled him to substantial benefits and commissions.

10. In 2018, Plaintiff was earning approximately $400,000 - $450,000 per year in salary and commissions, which included anywhere between $80,000 - $120,000 per year on renewals and conservation on his book of business.

11. Plaintiff was named a member of the Million Dollar Round Table from 2007 – 2019, which is an association reserved for the top 10% of financial professionals in the industry. To qualify for the Million Dollar Round Table, a financial advisor must achieve a high level of first-year sales as well as meet a higher level of ethical conduct and practice standards.

12. Plaintiff was named Court of the Table for the Million Dollar Round Table from 2010 – 2019. This position is reserved for top producing financial advisors who achieve three (3) times the requirement of a normal member.

13. While employed with Western & Southern, Plaintiff had never had a single consumer complaint lodged against him neither with Western & Southern nor with any state's Insurance Commissioner's Office.[1]

14. Plaintiff had never been written-up, counseled, or received any sort of disciplinary action from Western & Southern or any overseeing insurance agency or commission.

15. Plaintiff was considered such a valuable asset that in October 2012, Western & Southern loaned the Plaintiff $85,000.00 to pay off a personal tax lien.

---

[1] Plaintiff was party to a civil suit in which a client brought suit against Western & Southern and Plaintiff for cancellation of a life insurance policy for lack of payment. *Rule v. Western & Southern Life Assurance, et al.,* Civil Action No. 2:12-cv-0981. This matter was settled out of court with no party admitting fault.

3

16. Plaintiff signed a written agreement agreeing to repay the loan and agreeing to payments on the loan being deducted from his paychecks until the loan was paid off. However, these loan payments were never deducted from his paycheck. When Plaintiff asked why payments were not being deducted from his paychecks, he was told "as much money as you are making for us, you don't have to worry about that $85,000.00."

17. In May 2013, while at a Leaders' Sales Meeting, Plaintiff witnessed an incident involving CEO and Chairman of the Board for Western & Southern John Barrett in which he sexually harassed former Western & Southern employee Kim Chiodi. Specifically, Kim Chiodi was wearing red underwear that were distinctly visible through her white pants, and Mr. Barrett chased Ms. Chiodi around the office grabbing at her buttocks singing "Little Red Riding Hood."

18. Four or five months after the incident, Plaintiff was asked to sign a non-disclosure agreement as to the events he witnessed between CEO John Barrett and Kim Chiodi.

19. Feeling uncomfortable with the request, Plaintiff refused to sign the nondisclosure agreement at which time he was warned by superiors that his employment with Western & Southern may be in jeopardy.

20. Not long after, Plaintiff was contacted by Kim Chiodi requesting that he sign a nondisclosure agreement in regard to the incident he witnessed at the Sales Leaders' Meeting between she and CEO John Barrett. Ms. Chiodi stated that she was authorized to forgive the $85,000.00 loan in exchange for Plaintiff signing a nondisclosure agreement.

21. Again, Plaintiff refused to sign a nondisclosure agreement after which he was warned that his employment could be in jeopardy.

22. In January 2019, Western & Southern had implemented a new compensation plan which resulted in a reduction in many of its field agents' take-home pay, including the Plaintiff's whose take-home pay was reduced approximately $100,000 per year.

23. In March 2019, Plaintiff turned fifty-three (53) years old.

24. Plaintiff fell subject to Western & Southern's long-term incentive retention plan ("LTIR"), which provides "cliff-vesting" of units to an associate after they have been with the company for seven (7) years. The "cliff-vesting" program is designed to incentivize associates to remain with Western & Southern rather than seek employment with competing firms. The units granted to an associate become 100% vested seven (7) years after they are awarded provided that the associate is still employed by the company.

25. In April 2019, Plaintiff had accrued approximately $387,000 in LTIR units which had fully vested, and approximately an additional $200,000 in LTIR units which were scheduled to vest when he turned 55-years-old.

26. Plaintiff had complained to supervisors regarding the reduction in his yearly take-home pay. As a result, Plaintiff was called to meet with the president for Western & Southern, Troy Brodie at Western & Southern's home offices in Cincinnati, Ohio.

27. On April 1, 2019, when Plaintiff presented to Western & Southern's home offices, he was met by Western & Southern president Troy Brodie and Western & Southern's Vice President of Human Resources and told that an audit of every contract the Plaintiff had written over the previous seven (7) years.

28. Mr. Brodie and VP of Human Resources informed the Plaintiff that they had found contracts that he had written which should have been marked as "replacements" but were not.

29. Plaintiff denied any wrongdoing stating that any application that he submitted as a non-replacement he believed to be derived from new money.

30. Plaintiff also pointed out that Western & Southern has a four-tiered compliance procedure when it comes to replacements to avoid any sort of inadvertent violation, and each of his non-replacement contracts was: (1) reviewed and signed off on by the Principle Agent; (2) which was then reviewed and signed off on by Western & Southern's Suitability Department; (3) which was then reviewed and signed off on by Western & Southern's Compliance Department; (4) which was then finally reviewed and signed off on by Western & Southern's Compensation Department.

31. Additionally, Plaintiff argued that in his 13 years as a producer for Western & Southern only one of his hundreds of the applications he had submitted was flagged by one of these 4 departments for being incorrectly marked as non-replacement.

32. At the conclusion of the meeting, Plaintiff was told that he was suspended until a more thorough investigation could be conducted.

33. Approximately three-and-a-half hours later, Plaintiff had arrived home to Elkview, West Virginia from the meeting in Cincinnati, Ohio when his phone rang. It was Western & Southern informing him that he was terminated for what they believed to be a violation of the company's replacement policy.

34. The following morning, on Tuesday, April 2, 2019, the Plaintiff attempted to retrieve his personal belongings and found that he was locked out of his office.

35. It was not until Thursday, April 4, 2019 that Western & Southern Divisional Vice President Josh Swogger permitted the Plaintiff access to his office to retrieve his furniture and other personal belongings.

36. Once inside the office, Plaintiff found that all of the locks had been busted off of his personally owned desk and filing cabinets damaging the office furniture beyond repair.

37. While gathering his belongings, Plaintiff was pulled aside by Western & Southern Divisional Vice President Josh Swogger who informed him that Western & Southern had authorized him to offer him part of the deferred $387,000 in compensation and benefits owed to him on the condition that the Plaintiff would voluntarily surrender his insurance license.

38. When the Plaintiff asked Josh Swogger why Western & Southern would authorize him to offer such a deal, Josh Swogger explained that Western & Southern would prefer to pay out his benefits rather than have him as a competitor in the field.

39. When the Plaintiff refused the offer, Josh Swogger threatened the Plaintiff that Western & Southern would do everything it could to drive Plaintiff out of the insurance business.

40. The very next day, on April 5, 2019, Western & Southern sent out notices of termination to the West Virginia Office of Insurance Commissioner, as well as the insurance commission in every other state in which the Plaintiff is licensed to sell insurance falsely representing that the Plaintiff was terminated for good cause for (1.) repeatedly failing to identify replacement transactions; (2) repeatedly paying for consumers to receive estate planning services as an inducement to purchase life insurance policies or annuity contracts; and (3) violating company policies regarding replacements and inducements.

41. Additionally, Western & Southern maliciously filed a Form U5 Uniform Termination Notice for Securities Industry Registration with FINRA with regard to the termination. Form U5 is used to report terminations related to securities transactions. Information on a Form U5 cannot be changed or altered by the subject agent and is publicly accessible to customers, colleagues, future potential employers, insurance regulators, insurance companies, etc.

42. Plaintiff sold insurance products and fixed annuities. Although licensed to do so, Plaintiff was not a securities broker and did not deal in securities.

43. On the Plaintiff's Form U5, Western & Southern falsely represented that Plaintiff (1.) repeatedly failed to identify replacement transactions and provide disclosures regarding replacements; (2.) repeatedly paid for consumers to receive estate planning services as an inducement to purchase life insurance/annuities; and (3.) violated Company policies regarding replacements and inducements.

44. Western & Southern deliberately submitted the false information on Plaintiff's Form U5 for purposes of damaging Plaintiff's reputation among future potential clients, future potential employers, insurance regulators, insurance companies, and others in the insurance industry.

45. Many insurance companies have refused to hire or have withdrawn offers of employment on the basis of the false and misleading information contained on the Plaintiff's Form U5.

46. Other insurance companies that would still hire Plaintiff withdrew signing bonus offers based on the false representations contained on Plaintiff's Form U5.

47. Despite Western & Southern's efforts to drive him from the insurance business, Plaintiff maintains good standing with regulatory agencies and continues working as an independent insurance and annuities agent.

48. On or about June 2019, representatives for Western & Southern began telephoning Plaintiff's former clients misrepresenting that the Plaintiff had been terminated for mishandling of their accounts and asking if they had any complaints against with regard to the Plaintiff and the services he provided.

49. Western & Southern agent Chris Mattox told one former client that the Plaintiff had engaged in illegal activity while handling accounts and would likely be going to jail.

50. Western & Southern agent Chris Mattox telephoned another former client, Jill Vigliotti misrepresenting to her that Plaintiff had stolen money from her accounts and had "run off" to Florida. *See* Affidavit of Jill Vigliotti, attached hereto as ***Exhibit A***.

51. In the fall of 2019, Western & Southern representatives began systematically calling Plaintiff's former clients requesting that they file consumer complaints against the Plaintiff with the West Virginia Office of Insurance Commissioner, offering to complete and submit complaint forms for them.

52. When Ms. Vigliotti refused stating that she was grateful for the Plaintiff's service as it was only because of him that she was able to retire early and care for her ailing husband, Western & Southern representatives relentlessly harassed her, calling her anywhere from 10 – 15 times over the next few months, each time attempting to intimidate her into filing a complaint with the Insurance Commissioner's Office against the Plaintiff.

53. When Ms. Vigliotti, fed up with Western & Southern's harassment, requested to move the money from her annuities and life insurance policy from Western & Southern to

another outside agent, Western & Southern refused to authorize the release of funds for more than 6 months in an attempt to intimidate her into filing a complaint with the Insurance Commissioner's Office against the Plaintiff.

54. In February 2020, Western & Southern client Paulette Graham, upon direction of a Western & Southern representative, filed a consumer complaint with the West Virginia Office of Insurance Commissioner against the Plaintiff.

55. Paulette Graham was never a client of the Plaintiff's, but rather her mother was a client prior to developing dementia. The annuity on which the complaint was based was not even a contract written by or signed off on by the Plaintiff, but rather was completed by a different Western & Southern agent.

56. In her consumer complaint, Ms. Graham indicated that Derek Davenport at Western & Southern corporate office informed her that the Plaintiff caused many Western & Southern clients to lose money including her mother and urged Ms. Graham to lodge a consumer complaint with the West Virginia Office of Insurance Commissioner against the Plaintiff.

57. Paulette Graham complained that no one at Western & Southern would help her with her mother's accounts until she filed a consumer complaint against the Plaintiff just as Western & Southern had requested.

58. In February 2020, Christie Stout Browning filed a meritless consumer complaint against the Plaintiff with the West Virginia Office of Insurance Commissioner containing inaccurate and misleading information regarding a Universal Life Policy she purchased from the Plaintiff in 2012. The Universal Life Policy was an alternative to the originally selected 20 Life Policy due to her A6 risk rating. At the time the policy

10

was purchased in 2012, Ms. Stout had represented that she understood and agreed to the terms of the policy.

59. Sometime after 2012, Christie Stout Browning became married to Jon Browning, an agent for Western & Southern

60. Based on information and belief, Western & Southern agent Jon Browning and other Western & Southern representatives coerced and conspired with Christie Stout Browning to file a complaint containing false allegations against the Plaintiff with the West Virginia Office of Insurance Commissioners.

61. The consumer complaint by Paulette Graham and the consumer complaint filed by Christie Stout Browning believed to have been prepared by Western & Southern representatives were both dated and submitted to the West Virginia Office of Insurance Commissioner on the same day on February 7, 2020.

62. On February 24, 2020, another consumer complaint was filed with the West Virginia Office of Insurance Commissioner against the Plaintiff, this time by Western & Southern customer Mabel Burdette.

63. Mabel Burdette had never been the Plaintiff's client. The Plaintiff had never even met Mabel Burdette. Mabel Burdette was a client of Western & Southern Life Agent Jeffrey Messer between 2018 – 2019.

64. According to Mabel Burdette's complaint filed with the West Virginia Office of Insurance Commissioner, her son, Ronnie Burdette dropped off a copy of her Will and other estate documents to Western & Southern's Elkview office which were then to be picked up by an estate attorney. After Western & Southern had terminated the Plaintiff

11

and closed the Elkview office in April 2019, Mabel Burdette requested Western & Southern return the documents.

65. When Mabel Burdette requested the documents be returned, a Western & Southern representative instructed her to file a consumer complaint against the Plaintiff with the West Virginia Office of Insurance Commissioner.

66. Even with no disciplinary action taken, the agent is required to report any complaints filed with the Office of the Insurance Commissioner to their professional liability insurer, which in turn nearly doubles yearly rates per complaint filed against the agent.

67. Although the West Virginia Office of Insurance Commissioner has proposed absolutely no disciplinary action against the Plaintiff for any of the consumer complaints filed, Plaintiff's professional liability insurance rates have nearly tripled as a result of the baseless consumer complaints Western & Southern coerced clients into filing against the Plaintiff.

68. Western & Southern, knowing that Plaintiff's liability insurance renewal was due on March 1, 2020, conspired with and coerced Plaintiff's former clients into filing consumer complaints against the Plaintiff with the West Virginia Office of the Insurance Commissioner in attempt at making his liability insurance rates so high that it would drive him from the insurance business.

69. Pursuant to his employment agreement with Western & Southern, Plaintiff has filed for arbitration for all employment claims such as wrongful termination, age discrimination, breach of contract, fraud, hostile work environment, infliction of emotional distress, and violation of West Virginia's Wage Payment and Collection Act, which is currently pending before the American Arbitration Association ("AAA").

70. Plaintiff brings the following claims for Defendants' acts taken after Plaintiff's termination from his employment with Western & Southern which do not fall subject to the arbitration clause contained in his employment agreement or the company's Dispute Resolution Program.

## COUNT I – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

71. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth within.

72. In refusing to surrender of his insurance license for four (4) years in exchange for a partial payout of $387,000 in LTIR benefits as offered by Western & Southern, Plaintiff indicated that he would be continuing in the insurance industry as a producer and would be actively competing with Western & Southern and Western & Southern agents for clients.

73. Defendants thereafter began systematically contacting Plaintiff's clients deliberately misleading them to believe that the Plaintiff had mishandled their accounts and would most likely be going to jail.

74. Defendants had perpetuated these misrepresentations throughout the community to the extent that Plaintiff was getting stopped in the local grocery store by friends, family, clients, potential clients and even potential employers inquiring as to whether he was going to jail for embezzlement and/or other crimes he allegedly committed while employed with Western & Southern.

75. Plaintiff lost out on sales and commissions and even employment opportunities due to Defendants' intentional dissemination of these misrepresentations.

76. Defendants misled one former client, Jill Vigliotti to believe that Plaintiff had stolen money from her accounts and had "run off" to Florida.

77. When Jill Vigliotti requested to transfer her money to the Plaintiff or other agent or agency, Defendants refused to authorize the release of Ms. Vigliotti's funds for nearly six (6) months prohibiting from transferring her business to the Plaintiff or any other producer or insurance firm.

78. Knowing the information reported would be publicly accessible to customers, colleagues, future employers, insurance regulators, insurance companies, etc., the Western & Southern Defendants filed a Form U5 Uniform Termination Notice for Securities Industry Registration with FINRA falsely representing that Plaintiff had repeatedly failed to identify replacement transactions and repeatedly paid for consumers to receive estate planning services as an inducement to purchase life insurance policies or annuity contracts.

79. A Form U5 is used to report terminations related to securities transactions.

80. The Western & Southern Defendants marked Plaintiff's Form U5 for termination for alleged acts related to the sale of insurance products and annuities, which are wholly unrelated to securities transactions and inappropriate for reporting on a Form U5.

81. The Western & Southern Defendants reported the false information regarding rebating and inducement on the Plaintiff's Form U5 for the specific purpose of interfering with business relations with customers, colleagues, future employers, competing insurance companies, etc., and ultimately eliminating the Plaintiff as a competitor in the insurance field as previously threatened.

82. Insurance companies refused to hire Plaintiff on the basis of the false and misleading information contained on Plaintiff's Form U5.

83. Other insurance companies who had made offers of employment to the Plaintiff withdrew those offers based on the false and misleading information contained on Plaintiff's Form U5.

84. Some insurance companies agreed to go forward in hiring the Plaintiff but withdrew offers of a signing bonus based on the false information placed on Plaintiff's Form U5 by the Western & Southern Defendants.

85. Defendants further systematically contacted Plaintiff's former clients coercing them into filing false and meritless consumer complaints with the West Virginia Office of the Insurance Commissioner against the Plaintiff.

86. The mere filing of these complaints caused Plaintiff's liability rates to nearly triple in cost.

87. One former client, Jill Vigliotti reported that Defendants contacted her continuously for months attempting to coerce her to file a consumer complaint with the West Virginia Office of the Insurance Commissioner against the Plaintiff.

88. Ms. Vigliotti reports that Defendants offered to send her the necessary paperwork to file the consumer complaint against the Plaintiff and even offered to file the consumer complaint for her.

89. Even after Ms. Vigliotti told Defendants that she had no interest in filing a complaint against the Plaintiff, Defendants continued calling her multiple times a week. Ms. Vigliotti stated that she felt harassed by Defendants to file an insurance complaint

against the Plaintiff, which she had no repeatedly expressed she had no interest in doing.

90. Due to Defendants tortious interference with business relations, the Plaintiff suffered loss of employment, loss of income from future sales and commissions, loss of employment signing bonuses, loss of other future business opportunities, and damage to both his professional and personal reputation.

## COUNT II – INTENTIONAL MISREPRESENTATION AND FRAUD

91. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraph as if fully set forth within.

92. Defendants intentionally disseminated false and misleading information about the Plaintiff among Plaintiff's former clients and into the community, specifically that he mishandled claims, embezzled money and would likely be going to jail, for the purposes of retaining Plaintiff's clients with Western & Southern and discouraging clients from doing business with Plaintiff.

93. Knowing the information reported would be publicly accessible to customers, colleagues, future employers, insurance regulators, insurance companies, etc., the Western & Southern Defendants filed a Form U5 Uniform Termination Notice for Securities Industry Registration with FINRA falsely representing that Plaintiff had repeatedly failed to identify replacement transactions as well as repeatedly paid for consumers to receive estate planning services as an inducement to purchase life insurance policies or annuity contracts.

94. Despite knowing it was inappropriate to report allegations pertaining to insurance and annuity matters such as replacements and rebating on a Form U5, the Western &

Southern Defendants reported information it knew to be false on Plaintiff's Form U5 in an effort to capture insurance and annuity sales from the Plaintiff and eliminate him as a competitor in the insurance industry altogether.

95. Defendants actively contacted clients representing information known to be false in an effort for the purposes of retaining Plaintiff's clients with Western & Southern and discouraging any clients, current and future, from doing business with the Plaintiff.

96. Defendants actively contacted and coerced customers into filing consumer complaints with the West Virginia Office of the Insurance Commissioner based on what they knew to be false information in an effort to drive Plaintiff from the insurance industry and eliminate him as a competitor in insurance and annuity industry.

97. Due to Defendants' intentional misrepresentation and fraud, the Plaintiff suffered loss of employment, loss of income from future sales and commissions, loss of employment signing bonuses, loss of other future business opportunities, and damage to both his professional and personal reputation.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

98. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraph as if fully set forth within.

99. In purposefully and systematically contacting Plaintiff's clients and members within his community misrepresenting that Plaintiff had mishandled claims, embezzled money from his clients, and faced criminal prosecution for such crimes, Defendants' conduct was atrocious, intolerable, and outrageous exceeding the bounds of decency.

100.  Contacting Plaintiff's clients and other members within the community disseminating these falsehoods was substantially certain to cause the Plaintiff to suffer emotional distress.

101.  Plaintiff suffered extreme anxiety and embarrassment about going out in public because he would be stopped by friends, family members, former clients, colleagues, and community members inquiring as to whether he was going to jail or going to have his insurance license revoked.

102.  Plaintiff suffered from extreme anxiety, nervousness, loss of sleep and loss of appetite for numerous months as a result of Defendants' behavior.

103.  By falsely reporting Plaintiff purposely failed to identify replacement transactions and paid for estate planning services as an inducement to customers to purchase life insurance products on Plaintiff's Form U5, the Western & Southern Defendants humiliated and irreparably damages Plaintiff's professional and personal reputation among customers, friends, family, colleagues, future employers, insurance regulators, insurance companies, etc., exceeding all bounds of decency.

104.  The Western & Southern Defendants' reporting of false information of Plaintiff's Form U5 was substantially certain to cause the Plaintiff to suffer emotional distress.

105.  Plaintiff suffered from embarrassment, humiliation, extreme anxiety and depression as a result of Western & Southern Defendants marking up his Form U5 which was readily available to customers, colleagues, future employers, insurance regulators, insurance companies, etc.

106.  Coercing clients to file false consumer complaints as well as assisting in the preparation and filing of said complaints with the West Virginia Office of Insurance

18

Commissioners constitutes extreme and outrageous conduct on the part of the Defendants.

107.    Coercing clients into filing false and misleading complaints and assisting in the preparation and filing of said complaints was substantially certain to cause the Plaintiff to suffer emotional distress.

108.    Plaintiff feared the loss of his ability to earn a living in that these false complaints put his insurance license in jeopardy.

109.    Plaintiff suffered from extreme anxiety, depression, loss of sleep, loss of appetite, difficulty with concentrating and/or focusing, racing thoughts and constant worry as a result of Defendants' extreme and outrageous behavior.

## DAMAGES

WHEREFORE, for reasons set forth in this Complaint, and for such other and further reasons as are apparent to this Honorable Court, Plaintiff respectfully requests judgment in favor of the Plaintiff and against the Defendants and requests that the Court award damages including, but not limited to all damages including but not limited to:

    a.    Loss of future wages and commissions;

    b.    Damages for indignity, embarrassment, humiliation, annoyance, inconvenience, emotional distress and punitive damages;

    c.    Pre and post judgment interest as provided by law; and

    d.    Attorneys' fees and costs.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

**RANDY YOUNG,**
**By Counsel**

19

Charles R. Bailey (WV Bar #0202)
Jeffrey M. Carder(WV Bar #12725)
BAILEY & WYANT, PLLC
500 Virginia Street, East, Suite 600
Post Office Box 3710
Charleston, West Virginia  25337-3710
(304) 345-4222

20

## AFFIDAVIT OF TERESA JILL VIGLIOTTI

The undersigned, Teresa Jill Vigliotti, being duly sworn, deposes and says as follows:

1.      I am over the age of eighteen, am not incarcerated, and have not been adjudicated incompetent.

2.      I am a resident of Elkview, West Virginia.

3.       I first met Randy Young in late 2013 when inquiring into my mother's life insurance policy with Western & Southern.

4.      I was extremely impressed with Mr. Young and became a client of Western & Southern Life soon after that first meeting.

5.      I rolled over a 401K and a 403B into two (2) deferred annuities, a SPIA account, and later purchased life insurance through Mr. Young when he was with Western & Southern.

6.      I was very happy with Mr. Young as my agent. Mr. Young had gone out of his way to help me in a number of ways.

7.      On or about June 2019, I received a phone call from Chris Mattox from Western & Southern informing me that Mr. Young had been terminated for cause and that he would be my agent going forward.

8.      I told Chris Maddox that I did not want him to be my agent but I wanted Randy Young to remain my agent.

9.      When I asked Mr. Mattox where Mr. Young had gone, Mr. Mattox told me that he did not know but he believes Mr. Young ran off to Florida implying that Randy had stolen money from my accounts and moved to Florida.



10.    After getting off the phone with Chris Mattox, I called Randy Young who immediately answered the phone.

11.    Mr. Young informed me that he was not in Florida and that my accounts were fine, but that he no longer worked for Western & Southern.

12.    I told Randy Young that I still wanted him to be my agent. Mr. Young told me that he could no longer be my agent due to a non-compete clause in his contract with Western & Southern. Mr. Young further advised me to not make any rash decisions about moving my money but that if I found that it was in my best interest, he could refer me to another agent.

13.    After meeting with Jonathan Matuszkiewicz and Ronald Kelley, I discovered that it was in my best interest to move my money from Western & Southern. I completed Transfer of Assets forms to transfer money which were then submitted to Western & Southern.

14.    After the Transfer of Assets forms were submitted, I received a call from Chris Mattox asking if I understood what I was doing and whether I was aware that I would be losing money by transferring my money. I informed Mr. Mattox that I was no longer comfortable with Western & Southern and no longer wanted to be a client.

15.    I estimate I received anywhere from ten (10) to fifteen (15) calls from Western & Southern representatives over the next several months trying to intimidate me into keeping my money with Western & Southern. Throughout this time, Western & Southern did not complete the transfer.

16. In the fall of 2019, I received a call from a Western & Southern representative informing me that the Elkview office was closed. The representative asked if I would be interested in filing a complaint against Randy Young with the Office of Insurance Commissioner. The Western & Southern representative offered to send me the complaint forms and assist me in filing the complaint. I explained that I had absolutely no interest in filing a complaint against Randy Young and I was very happy with him as my agent.

17. The calls from Western & Southern continued to point that it was harassment.

18. I continued requesting Western & Southern release my funds to my new agents. I had first requested the transfer in October 2019 and by February 2020 the transfer still had not been authorized.

19. On February 19, 2020, I submitted a consumer complaint to the West Virginia Office of Insurance Commissioners Office against Western & Southern for their failure to authorize the release of my money. It was not until March 2020 that Western & Southern authorized the release.

_____

Teresa Jill Vighotti

**STATE OF WEST VIRGINIA**
**COUNTY OF** Kanawha **, to-wit:**

Taken, subscribed, and sworn to before me, the undersigned Notary Public, this 5th day of March , 20 20 .

My commission expires _March 07,2021_

[SEAL]

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Rosemary S. Shrader
178 Westwood Drive
Elkview, WV 25071
My Commission Expires March 07, 2021

NOTARY PUBLIC

## CIVIL CASE INFORMATION STATEMENT
## CIVIL CASES

FILED

2021 MAR 31  PM 2: 41

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

**I.    CASE STYLE:**

**RANDY YOUNG,**

    **Plaintiff,**

**v.**

Civil Action No.: 21-C-277
Judge:  King

**WESTERN-SOUTHERN AGENCY, INC. AKA
WESTERN & SOUTHERN FINANCIAL GROUP,
WESTERN-SOUTHERN LIFE ASSURANCE
COMPANY AKA WESTERN & SOUTHERN
LIFE INSURANCE COMPANY, AND CHRIS
MATTOX,**

    **Defendants.**

| Western-Southern Life Assurance Company aka Western & Southern Life Insurance Company c/o CT Corporation System | 30 | Secretary of State |
|---|---|---|
| Name | | |
| 1627 Quarrier Street | | |
| Street | | |
| Charleston, WV 25311-2124 | | |
| City, State, Zip | | |

| Chris Mattox | 20 | Personal |
|---|---|---|
| Name | | |
| Western & Southern Life 200 Association Drive Forbes Center, Ste. 150 | | |
| Street | | |
| Charleston, WV 25311 | | |
| City, State, Zip | | |

Western-Southern Agency, Inc.                                30          Secretary of State
aka Western & Southern Financial Group
c/o Timothy D. Speed
_____
                        Name
P. O. Box 1075
_____
                        Street
Cincinnati, OH 45201
_____
                    City, State, Zip


Original and 12  copies of Complaint furnished herewith.

**I.    Parties**

| | |
|---|---|
| **PLAINTIFF(S):** | RANDY YOUNG,<br><br>  Plaintiff, |
| **DEFENDANT(S):** | WESTERN-SOUTHERN AGENCY, INC. aka WESTERN &<br>SOUTHERN FINANCIAL GROUP, WESTERN-<br>SOUTHERN LIFE ASSURANCE COMPANY aka<br>WESTERN & SOUTHERN LIFE INSURANCE COMPANY<br>and CHRIS MATTOX,<br><br>  Defendants. |

Civil Action No._____
Judge_____

**II.    Type of Case**

| TORTS | | OTHER CIVIL | |
|---|---|---|---|
| Asbestos | Adoption | Appeal from<br>Magistrate Court | |
| Professional Malpractice | Contract | Petition for Modification<br>of Magistrate Sentence | |
| Personal Injury | Real Property | Miscellaneous Civil | |
| Product Liability | Mental Health | Other | |
| **Other Tort** | Appeal of<br>Administrative Agency | | |

**III.    Jury Demand**        _x_  Yes    __  No

Case will be read for trial by (month/year): 3/2022

**IV.    Do you or any of your clients or witnesses in this require special accommodations due to a disability or age?**

__  Yes    _x_  No

If Yes, please specify:

__  Wheelchair accessible hearing room and other facilities

__  Interpreter or other auxiliary aid for the hearing impaired
__  Reader or other auxiliary aid for the visually impaired
__  Spokesperson or other auxiliary aid for the speech impaired
__  Other:

| | | | |
|---|---|---|---|
| **Attorney Name:** | Charles R. Bailey<br>Jeffrey M. Carder | _x_  Plaintiff | __  Defendant |
| **Firm:** | Bailey & Wyant, PLLC | __  Cross-Complainant | |
| **Address:** | 500 Virginia Street East, Suite 600<br>Charleston, WV 25301 | __  Cross-Defendant | |
| **Telephone:** | (304) 345-4222 | | |

Signature: _____    Date: March 31, 2021